# EXHIBIT A

# Post-Petition Loan and Security Agreement

**POST-PETITION LOAN AND SECURITY
AGREEMENT**

**dated as of**

**June ___, 2015**

**between**

**KOLO RETAIL, LLC as Borrower**

**AND**

**ITO-YA LTD as Lender**

**$100,000.00**

1

THIS **POST-PETITION LOAN AND SECURITY AGREEMENT** ("Agreement") is dated effective as of June __, 2015 by and between **KOLO RETAIL, LLC**, a Connecticut limited liability company as debtor in possession ("Borrower") and **ITO-YA LTD**, as lender ("Lender").

## RECITALS

**WHEREAS,** on June 29, 2015 ("Petition Date") Borrower commenced a case (the "Bankruptcy Case") under Chapter 11 of Title 11, United States Code, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court") and is continuing to operate its business and manage its properties as a debtor and debtor- in-possession under Sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS,** Borrower has requested that Lender make available to Borrower, through separate Advances (defined below) to be made from time to time at Lender's discretion, a senior secured super-priority line of credit (the "Loan") in an original principal amount not to exceed ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($100,000.00) in the aggregate, the proceeds of which shall be used by Borrower exclusively for funding certain of Borrower's inventory purchases as set forth herein; and

**WHEREAS,** Borrower is unable to obtain funds or credit on any other terms; and

**WHEREAS,** as an inducement to Lender providing said financing, Kolo, LLC, a Delaware limited liability company and an affiliate of the Borrower ("Guarantor"), has agreed to guaranty Borrower's obligations under the Loan; and

**WHEREAS,** Lender is willing to provide such Loan to Borrower but only upon the terms and conditions set forth herein and in the Financing Orders (as hereinafter defined), including the requirements (A) that such Loan is allowed super-priority administrative expense status with priority over all other administrative expense claims in the Bankruptcy Case, with each new Advance being secured by a first priority Lien (as defined below) superior to all other Liens held by any other lienholder subject only to the Carve-outs and the Permitted Encumbrances (as defined below), on all of the assets of Borrower except in each instance as otherwise set forth in this Agreement, and (B) that such Loan is guaranteed by the Guarantor and secured by assets of the Guarantor as further set forth herein;

**NOW, THEREFORE,** in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender hereby agree as follows:

## ARTICLE I.
### Definitions

Section 1.01. Defined Terms.   As used in this Agreement, the following terms shall have the following meanings:

**Accounts** shall have the meaning assigned thereto in the UCC.

2

**Account Debtor** shall mean any Person who is obligated under an Account.

**Advance** shall mean a borrowing under the Loan, including the Initial Advance and the Incremental Advances.

**Affiliate** shall mean, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

**Anniversary Date** shall mean one-hundred eighty (180) days from the date hereof, provided, however, Lender may extend such Anniversary Date in its sole and absolute discretion.

**Bankruptcy Case** shall have the meaning ascribed to such term in the recitals hereof.

**Bankruptcy Code** shall have the meaning ascribed to such term in the recitals hereof.

**Bankruptcy Court** shall have the meaning ascribed to such term in the recitals hereof.

**Bankruptcy Rule** shall mean the Federal Rules of Bankruptcy Procedure.

**Borrowing Date** shall have the meaning given such term in Section 2.05.

**Business** shall mean the business activities of Borrower of designing, marketing, promoting, selling, distributing, licensing and managing goods, including, but not limited to photo albums, photo books, archival boxes, frames, binders and related accessories.

**Business Day** shall mean any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of Connecticut or is a day on which banking institutions in such state are closed.

**Capital Expenditures** shall mean, for any period, with respect to any Person, the aggregate expenditures of such Person during such period on account of, property, plant, equipment or similar fixed assets that, in conformity with GAAP, are required to be reflected in the balance sheet of such Person, on a non-consolidated basis, including without limitation the portion of each Capital Lease that is or should be capitalized in accordance with GAAP.

**Capital Lease** shall mean with respect to any Person, any lease of property (whether real, personal or mixed) which, in conformity with GAAP, is accounted for as a capital lease or a Capital Expenditure on the balance sheet of such Person, on a non-consolidated basis.

**Carve-outs** shall have the meaning ascribed to such term in the Financing Orders.

**Change of Control** shall mean, with respect to Borrower, the occurrence of any of the following: any merger, consolidation, reorganization, recapitalization or share or interest exchange involving any such Person, (ii) any holder of Borrower's capital stock, securities or equity, partnership or ownership interests on the date hereof ceases to own 100% of the capital

3

stock securities or equity, partnership or ownership interests held by such Person on the date hereof, or (iii) a direct or indirect sale, transfer or other conveyance or disposition, in any single transaction or series of transactions, of all or substantially all of its assets.

**Collateral** shall mean all of Borrower's real and personal property, both tangible and intangible property, including without limitation, that property listed on **Schedule 4.01** attached hereto and made a part hereof.

**Control** shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

**Default** shall mean an Event of Default, as set forth in Article X hereof.

**Default Rate** shall mean a rate of interest per annum equal to the rate that is five percent (5%) above the Loan Rate. The Default Rate shall be calculated based on a 360-day year.

**DIP Loan Documents** shall mean, collectively and each individually, the Agreement, the Loan Note, the Security Documents, the Guaranty Documents, the Financing Orders, and all other agreements, documents, instruments and certificates heretofore or hereafter executed or delivered to Lender in connection with any of the foregoing or the Loan, as the same may be amended, modified or supplemented from time to time.

**Event(s) of Default** shall have the meaning provided for in Article X.

**Facility Cap** shall have the meaning provided for in Section 2.01.

**Final Financing Order** shall mean an order that is entered by the Bankruptcy Court in the Bankruptcy Case pursuant to Sections 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), which authorizes Borrower to incur post-petition secured indebtedness under the Loan in accordance with the DIP Loan Documents.

**Financing Order** shall mean collectively, the Interim Financing Order and the Final Financing Order.

**GAAP** shall mean generally accepted accounting principles in the United States of America as in effect from time to time and for the period as to which such accounting principles are to apply.

**Governmental Authority** shall mean the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

**Guarantor** shall mean Kolo, LLC, a Delaware limited liability company.

4

**Guaranty** shall mean that certain unconditional continuing guaranty in the form attached hereto as **Exhibit B** executed by Guarantor in favor of Lender.

**Guaranty Documents** shall mean the Guaranty, and such security instruments, documents and agreements executed and/or provided by Guarantor (including, without limitation, UCC financing statements) as Lender shall deem reasonably necessary to create or perfect a Lien on Guarantor's assets.

**Incremental Advance** shall mean all Advances by Lender, other than the Initial Advance.

**Indebtedness** of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding accounts payable incurred in the ordinary course of business that are not more than 90 days past due and excluding installments of premiums payable with respect to policies of insurance contracted for in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all guarantees by such Person of Indebtedness of others, (h) all obligations under Capital Leases of such Person attributable to the payment of principal, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

**Initial Advance** shall mean the initial Advance plus all accrued and unpaid interest, fees, costs, expenses, indemnities and premiums thereon or with respect thereto.

**Interim Financing Order** shall mean an order that is entered by the Bankruptcy Court in the Bankruptcy Case pursuant to Sections 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), which authorizes Borrower, on an interim basis, to incur post-petition secured indebtedness under the Loan in accordance with the DIP Loan Documents.

**Inventory** shall mean all of Borrower's present and hereafter acquired inventory (as defined in the UCC) and including, without limitation, all merchandise, inventory and goods, and all additions, substitutions and replacements thereof, wherever located, together with all goods and materials used or usable in manufacturing, processing, packaging or shipping same in all stages of production - from raw materials through work-in-process to finished goods - and all proceeds thereof of whatever sort.

**ITC** shall mean Itoya Topdrawer Corp.

**ITC Inventory** shall mean such Inventory, consistent with that previously purchased by Borrower in the conduct of its Business, to be purchased by Borrower with Advance proceeds, all as further set forth in Section 2.05 hereof.

**Lien** shall mean with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

**Loan** shall have the meaning given such term in the recitals hereof.

**Loan Note** shall mean a certain Commercial Promissory Note of Borrower in the form of **Exhibit A** to this Agreement, delivered by Borrower to Lender to evidence the Loan.

**Loan Rate** shall mean an interest rate equal to 5% per annum.

**Material Adverse Effect** shall mean any event, condition or circumstance or set of events, conditions or circumstances or any change(s) which (i) has, had or would reasonably be likely to have any material adverse effect upon or change in the validity or enforceability of any DIP Loan Document; (ii) has been or would reasonably be likely to be material and adverse to the value of any of the Collateral, to the priority of Lender's security interest in the Collateral, or to the business, assets, operations, liabilities, prospects or condition, financial or otherwise, of Borrower, whether individually or taken as a whole; or (iii) has materially impaired or would reasonably be likely to materially impair the ability of Borrower to pay any portion of the Obligations or to otherwise perform the Obligations or to consummate the transactions under the DIP Loan Documents executed by such Person.

**Maturity Date** shall have the meaning given such term in Section 2.07.

**Obligations** shall mean all present and future obligations, Indebtedness and liabilities of Borrower to Lender at any time and from time to time of every kind, nature and description, direct or indirect, secured or unsecured, joint and several, absolute or contingent, due or to become due, matured or unmatured, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, whether under any of the DIP Loan Documents or otherwise relating to the Loan Note, the Loan and/or any other obligations of Borrower to Lender, including, without limitation, all obligations, liabilities and Indebtedness owing to Lender in respect of obligations, liabilities and Indebtedness owing to Lender in respect of Advances, and all other applicable fees, costs, charges and expenses (including attorneys' fees) and/or all amounts paid or advanced by Lender on behalf of or for the benefit of Borrower for any reason at any time, including in each case obligations of performance as well as obligations of principal and interest that accrues after the commencement of any proceeding under any debtor relief Law by or against any such Person.

6

**Permitted Encumbrances** shall mean those Liens listed in **Schedule 7.06** attached hereto existing as of the date hereof and consented to by Lender as further defined in Section 7.06 hereof.

**Person** shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership or other entity.

**Petition Date** shall mean the date of Borrower's filing of its voluntary petition for relief pursuant to the Bankruptcy Code as set forth in the recitals to this Agreement.

**Request for Advance** shall have the meaning given such term in Section 2.05 hereof.

**Security Documents** shall mean the Loan Note, this Agreement, UCC financing statements and all other agreements, documents or instruments necessary to create or perfect the Liens in the Collateral or pursuant to which any Person grants to Lender collateral in any form as security for the payment of the Obligations, as such may be modified, amended or supplemented from time to time.

**Superpriority Claim** shall have the meaning provided therefor in the Financing Orders.

**Taxes** shall mean all United States federal and state, all municipal and other governmental taxes, levies, imposts, duties, fees, charges, claims and assessments which are or may be due by Borrower with respect to its business, operations, Collateral or otherwise.

**UCC** shall mean the Uniform Commercial Code as the same may be amended and in effect from time to time in the State of Connecticut.

Section 1.02. Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.03. Accounting Terms; GAAP. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with

GAAP, as in effect from time to time.

## ARTICLE II.
## Loan

Section 2.01. <u>Loan</u>. Subject to the provisions of this Agreement and the Financing Orders, so long as there exists no Event of Default or event or condition which, with the passage of time, the giving of notice or both, would constitute an Event of Default, Lender may make the Loan available to Borrower through Advances made, from time to time from the date all conditions set forth in Sections 2.02, 3.01 and 3.02 are satisfied up to and until (but not including) the Maturity Date, in an amount not to exceed, in the aggregate, $100,000 (the "Facility Cap"). Borrower's obligation under the Loan shall be evidenced by the Loan Note and shall be secured by the Collateral.

Section 2.02. <u>Interest</u>.

(a) Borrower shall pay interest to Lender on all outstanding amounts owed in respect of the Loan at the rate per annum, absent an Event of Default, equal to the Loan Rate.

(b) Unless required earlier pursuant to the terms of this Agreement or the Financing Orders, interest accrued on the Loan shall be due on the first day of each month (for the immediately preceding month), computed through the last calendar day of the preceding month on the unpaid principal balance thereof at the Loan Rate.

(c) If any payment of the Loan becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day.

(d) All computations of interest shall be calculated on a per annum basis and shall be made on the basis of a 365-day year, in each case for the actual number of days occurring in the period for which such interest is payable.

(e) Notwithstanding anything herein to the contrary, upon and after the occurrence of an Event of Default or the Maturity Date, the Loan shall bear interest at the Default Rate.

Section 2.03. <u>Principal Payment</u>. Unless required earlier pursuant to the terms of this Agreement (including, without limitation, upon the occurrence of an Event of Default) or the Financing Orders, the entire principal balance of the Loan, together with all accrued and unpaid interest thereon and all costs arising pursuant thereto, shall be due and payable in full on the Maturity Date.

Section 2.04. <u>Exclusive Use of Proceeds</u>. Advances shall be used exclusively for the purpose of funding Borrower's purchase, from ITC, of the ITC Inventory in accordance with Section 2.05 hereof.

8

Section 2.05. <u>Request for Advances</u>. Whenever Borrower requests Lender to make an Advance under the Loan, it shall deliver a written request therefore ("Request for Advance") to an authorized officer of Lender, in writing, specifying (A) the amount to be borrowed, (B) the requested borrowing date, which shall be a Business Day at least 2 Business Days after Lender's deemed receipt of said notice, but in any event prior to the Maturity Date or earlier termination of this Agreement as further set forth herein (the "Borrowing Date"), and (C) an itemization of the ITC Inventory to be purchased with the Advance. Each Request for Advance shall be accompanied by a copy of the invoice or purchase order (as applicable) for the ITC Inventory identified on the Request for Advance ("ITC Order"), together with such additional documents in respect thereof as Lender may require. Requests for Advances under the Loan shall be made solely by Borrower and shall be directed solely to Lender. Lender shall have the right to deny any such request for an Advance, in its sole and absolute discretion, without incurring any liability of any kind therefor. Advances shall never exceed, at any point in time, the difference between the unpaid principal balance then existing and the Facility Cap. Notwithstanding the foregoing, in the event that, at any time, the aggregate principal balance of all Advances does exceed the Facility Cap, (i) the Loan Note shall evidence the Borrower's obligation to pay the full amount outstanding including, without limitation, the excess principal balance; and (ii) without notice or demand, Borrower shall immediately prepay the principal amount in excess of the Facility Cap.

Section 2.06. <u>Voluntary Prepayments; Voluntary Termination</u>.

( a )  Upon prior written notice to Lender, Borrower may prepay the Loan in whole or in part without penalty or premium.

( b )  Borrower may, at its option, terminate this Agreement upon (i) prior written notice to Lender and (ii) payment to Lender, on the effective date of such termination, of the then outstanding principal balance of the Loan, together with all accrued interest and any and all other costs and charges due under the terms of this Agreement, the Loan Note, the other DIP Loan Documents and the Financing Orders.

Section 2.07. <u>Maturity</u>. All Advances and all other outstanding Obligations under the Loan and this Agreement shall be immediately due and payable in full in cash, if not earlier in accordance with the terms of this Agreement and the Financing Orders, without further application to the Bankruptcy Court, on the earliest of (a) acceleration of maturity of the Obligations upon the occurrence of an Event of Default in accordance with Section 10.02 hereof; (b) the Anniversary Date; (c) the effective date of a plan of reorganization approved by the Bankruptcy Court; and (d) the effective date of the appointment of a Bankruptcy trustee under Section 1106 of the Bankruptcy Code (such earliest date being the "Maturity Date").

Section 2.08. <u>All Advances to Constitute One Loan</u>.

(a) All loans and Advances by Lender to Borrower under this Agreement shall constitute one obligation of Borrower, secured by Lender's security interest in all of the Collateral granted hereunder, and by all other security interests, liens, claims and encumbrances heretofore, now or at any time or times hereafter granted by Borrower to Lender.

(b) This Agreement shall remain a continuing agreement between Borrower and Lender until the Maturity Date or earlier termination pursuant to Section 2.06(b) hereof, notwithstanding the fact that the balance due Lender may, from time to time, be zero.

(c) Borrower irrevocably authorizes and directs Lender to record in Lender's records the date and principal amount of each Advance and of each payment made by Borrower to Lender. No failure of Lender to make such notations, however, shall relieve Borrower of any obligations under this Agreement or the Loan Note.

Section 2.09. <u>Discretion</u>. Nothing contained herein shall, at any time, require Lender to make Advances or other extensions of credit to Borrower, and the making and amount of any Advances or other extensions of credit hereunder shall at all times be in Lender's sole and absolute discretion.

## ARTICLE III.
## Conditions to Advances

Section 3.01. <u>Conditions to Initial Advance and Closing</u>. The obligations of Lender to consummate the transactions contemplated herein, to make the Initial Advance or any Incremental Advance under the Loan are subject, in each case, to the satisfaction, in the sole judgment of Lender, of the following:

(a)     Borrower shall have delivered to Lender:

(i)     the Loan Note and other Security Documents to which it is a party, each duly executed by an authorized officer of Borrower and the other parties thereto;

(ii)    the Guaranty and other Guaranty Documents, each duly executed by an authorized officer of Guarantor and the other parties thereto;

(iii)   a Request for Advance with respect to the Initial Advance, executed by an authorized officer of Borrower and accompanied by an ITC Order and such other information regarding the purpose of the Advance as Lender may require;

(iv)    a certificate of the corporate secretary or managing member of Borrower and Guarantor dated as of the date hereof, certifying as to the incumbency and signature of the Persons executing the DIP Loan Documents, in form and substance acceptable to Lender;

(v)     certificates of the insurance required hereunder, with all hazard insurance containing a lender's loss payable endorsement in the Lender's favor and with all liability insurance naming Lender as an additional insured; and

(vi)    such other documents as Lender, in its sole discretion, may require; and

(b)     The Bankruptcy Court shall have entered the Interim Financing Order in the

Bankruptcy Case and such order shall be in full force and effect and shall not have been vacated, reversed, modified or stayed in any respect (and, if such order is the subject of a pending appeal, no further performance of any obligation of any party shall have been stayed pending appeal).

Section 3.02. <u>Conditions to Each Advance</u>. The undertaking of Lender to make any Advance including, without limitation, the Initial Advance in each case is subject to Lender's satisfaction, in the sole judgment of Lender, of the following additional conditions precedent:

(a)      at the time of each Advance, Borrower shall have delivered to Lender a Request for Advance, accompanied by the ITC Orders (and such other information as Lender may require) prepared in accordance with Section 2.05 hereof and executed by an authorized officer of Borrower, which shall constitute a representation and warranty by Borrower as of the Borrowing Date of such Advance that the conditions contained in this Section 3.02 have been satisfied; provided, however, that any determination as to whether to fund Advances or extensions of credit, shall be made by Lender in its sole discretion;

(b)      at the time of each Advance and Request for Advance therefor: (i) each of the representations and warranties made by Borrower in or pursuant to this Agreement or the other DIP Loan Documents shall be true and correct on and as of such date, before and after giving effect to such Advance and Borrower shall be in compliance with all the terms and provisions set forth herein and in the other DIP Loan Documents; (ii) no Event of Default shall have occurred or be continuing or would exist after giving effect to the Advance under the Loan on such date;  and (iii) this Agreement, the other DIP Loan Documents,  and each other agreement, instrument or other document executed in connection herewith or therewith shall be and remain in full force and effect;

(c)      immediately after giving effect to the requested Advance, the sum of the aggregate outstanding principal amount of Advances under the Loan shall not exceed the Facility Cap then in effect; and

(d)      the Interim Financing Order or the Final Financing Order, as the case may be, shall remain in full force and effect and shall not have been reversed, stayed, modified or amended absent the prior written consent of Lender.

**ARTICLE IV.**
**<u>Collateral</u>**

Section 4.01. <u>Grant of Security Interest</u>.

(a)      As security for the prompt payment in full of all Obligations, Borrower hereby pledges,  assigns, conveys, grants and sets over unto Lender a continuing first priority lien and security interest in, all of the right, title and interest of Borrower in and to all Collateral (as set forth on **Schedule 4.01** attached hereto), any and all additions and accessions thereto, and any and all replacements, products and proceeds (including insurance proceeds) thereof, subject only to (i) the Carve-outs and (ii) the Permitted Encumbrances.

11

(b)    Borrower acknowledges that, pursuant to the Financing Orders, the Liens granted in favor of Lender in all of the Collateral shall be perfected without the recordation of any UCC financing statements, notices of Lien or other instruments of mortgage or assignment. Borrower further agrees that Lender is authorized to file or record financing statements with respect to the Collateral without the signature of Borrower in such form and in such offices as Lender reasonably determines appropriate to further evidence the perfection of the security interests of Lender under this Agreement and to use the collateral description "all assets of the Debtor" in any such financing statements.

(c)    The Liens, lien priority, administrative priorities and other rights and remedies granted to Lender, in the Financing Orders and the other DIP Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided therein, and the administrative priority provided therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any other act or omission whatsoever until the full performance and irrevocable payment in full in cash of the Obligations and termination of this Agreement in accordance with the terms hereof.

Section 4.02.  Intentionally Deleted.

Section 4.03.  Continuing Security Interest. The rights and security interests granted to Lender hereunder are to continue in full force and effect, notwithstanding the termination of this Agreement, until the final payment in full to Lender of all Obligations and the termination of this Agreement. Any delay, or omission by Lender to exercise any right hereunder shall not be deemed a waiver thereof, or be deemed a waiver of any other right, unless such waiver shall be in writing and signed by Lender. A waiver on any one occasion shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion.

Section 4.04.  No Marshalling.    Notwithstanding Lender's security interest in the Collateral and to the extent that the Obligations are now or hereafter secured by any assets or property other than the Collateral or by the guarantee, endorsement, assets or property of any other person, Lender shall have the right in its sole discretion to determine which rights, liens, security interests or remedies Lender shall at any time pursue, foreclose upon, relinquish, subordinate, modify or take any other action with respect to, without in any way modifying or affecting any of them, or any of Lender's rights hereunder.

Section 4.05.  Future Obligations. The security interests granted herein, and any other Lien Lender may have in any other assets of Borrower, shall secure payment and performance of all now existing and future Obligations.

Section 4.06.  Superpriority Claim.  Subject to the Carve-outs, the Obligations of the Borrower arising hereunder after the date hereof and the execution of this Agreement shall constitute, in accordance with Section 364(c) of the Bankruptcy Code, a superpriority administrative claim having priority over any and all administrative expenses of and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever,

12

including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code ("Superpriority Claim"). Lender shall have a Superpriority Claim against the Borrower's estate pursuant to Section 364(c) of the Bankruptcy Code for the Obligations and all related costs and expenses, which shall be prior, senior and superior to any other claim, including any other superpriority administrative claim of any kind or nature, except as provided herein and/or in the Financing Orders. The Obligations of the Borrower hereunder are claims to be afforded priority over administrative expenses pursuant to Section 364(c)(1) of the Bankruptcy Code, as provided herein and/or in the Financing Orders and secured by liens pursuant to Section 364 of the Bankruptcy Code as provided herein.

Section 4.07.  <u>Guaranty</u>.  The Obligations of Borrower hereunder are unconditionally and irrevocably guaranteed by Guarantor pursuant to that certain Guaranty Agreement of even date herewith.

Section 4.08.  <u>Security Interests Granted by Guarantor</u>.  To secure its obligations arising pursuant to the Guaranty, Guarantor has granted to Lender a security interest in all assets of the Guarantor including, without limitation, its Intellectual Property, pursuant to a security agreement and related security instruments.

Section 4.09.  <u>Intentionally Deleted.</u>

Section 4.10.  <u>Assignment of Insurance</u>.  As additional security for the payment and performance of the Obligations, the Borrower hereby assigns to the Lender any and all monies (including proceeds of insurance and refunds of unearned premiums) due or to become due under, and all other rights of the Borrower with respect to, any and all policies of insurance now or at any time hereafter covering the Collateral or any evidence thereof or any business records or valuable papers pertaining thereto. At any time, whether or not a Default Period then exists, the Lender may (but need not), in the Lender's name or in the Borrower's name, execute and deliver proof of claim, receive all such monies, endorse checks and other instruments representing payment of such monies, and adjust, litigate, compromise or release any claim against the issuer of any such policy. Any monies received as payment for any loss under any insurance policy mentioned above (other than liability insurance policies) or as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid over to the Lender to be applied, at the option of the Lender, either to the prepayment of the Obligations or shall be disbursed to the Borrower under staged payment terms reasonably satisfactory to the Lender for application to the cost of repairs, replacements, or restorations.

Section 4.11.  <u>Lender's Obligation Regarding Collateral</u>. The Lender's duty of care with respect to Collateral in its possession (as imposed by law) shall be deemed fulfilled if it exercises reasonable care in physically keeping such Collateral, or in the case of Collateral in the custody or possession of a bailee or other third Person, exercises reasonable care in the selection of the bailee or other third Person, and the Lender need not otherwise preserve, protect, insure or care for any Collateral. The Lender shall not be obligated to preserve any rights the Borrower may have against prior parties, to realize on the Collateral at all or in any particular manner or order or to apply any cash proceeds of the Collateral in any particular order of application. The Lender has no obligation to clean-up or otherwise prepare the Collateral for sale. The Borrower waives

13

any right it may have to require the Lender to pursue any third Person for any of the Obligations.

Section 4.12. <u>Survival</u>. The Liens, lien priority, administrative priorities and other rights and remedies granted to the Lender pursuant to this Agreement, the Financing Orders and the other DIP Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Bankruptcy Case, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)   except for the Carve-outs, no costs or expenses of administration which have been or may be incurred in the Bankruptcy Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Lender against the Borrower in respect of any of the Obligations;

(b)   subject to (i) and (ii) of Section 4.01, the Liens in favor of Lender set forth herein and in the other DIP Loan Documents shall constitute valid and perfected priming first priority Liens and shall be prior to all other Liens, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)   the Liens in favor of the Lender set forth herein and in the other DIP Loan Documents shall continue to be valid and perfected without the necessity that the Lender file or record financing statements, mortgages or otherwise perfect its Lien under applicable non-bankruptcy law.

## ARTICLE V.
## <u>Representations and Warranties</u>

Borrower represents and warrants to Lender that:

Section 5.01. <u>Organization; Powers</u>. Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and has all requisite power and authority to carry on its business as now conducted. Except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, Borrower is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

Section 5.02. <u>Authorization</u>. Subject to the entry of the Financing Orders, this Agreement, the other DIP Loan Documents to which Borrower is a party, and the transactions contemplated to occur hereunder and thereunder are within Borrower's corporate powers and have been duly authorized by all necessary corporate action.

Section 5.03. <u>DIP Loan Documents</u>. Upon entry of the Interim Financing Order, the execution, delivery and performance by Borrower of the DIP Loan Documents to which it is a

party, and the consummation of the transactions contemplated thereby, (i) have been duly authorized by all requisite action of Borrower and have been duly executed and delivered by or on behalf of Borrower; (ii) do not violate any provisions of (A) applicable law, statute, rule, regulation or ordinance, (B) any order of any Governmental Authority binding on Borrower or any of its properties, or (C) the charter or operating agreement of Borrower; (iii) are not in conflict with, and will not result in a breach or default of or constitute an event of default, or an event, fact, condition or circumstance which, with notice or passage of time, or both, would constitute or result in a conflict, breach, default or event of default under, any indenture, agreement or other instrument to which Borrower is a party, or by which its properties or assets are bound (other than conflicts, breaches, and defaults the enforcement of which is stayed by virtue of the filing of the Bankruptcy Case or the Financing Orders); (iv) except as set forth herein and in the Financing Orders, will not result in the creation or imposition of any Lien of any nature upon any of the properties or assets of Borrower, and (v) do not require the consent, approval or authorization of, or filing with, any Governmental Authority or any other Person, except for the entry of the Interim Financing Order. When executed and delivered, and upon entry of the Interim Financing Order, each of the DIP Loan Documents to which Borrower is a party will constitute the legal, valid and binding obligation of Borrower, enforceable against it in accordance with its terms.

Section 5.04. <u>Properties</u>. Borrower is a sole owner and has good, valid and marketable title to, or a valid leasehold interest in, all of its properties and assets, including the Collateral, subject to no transfer restrictions or Liens of any kind except for Permitted Encumbrances.

Section 5.05. <u>Litigation</u>. Excluding pre-Petition Date litigation which is stayed by the provisions of Section 362 of the Bankruptcy Code, there is no action, suit, arbitration, proceeding or investigation pending or, to Borrower's knowledge, threatened against Borrower that (i) questions, seeks to enjoin, or could in any way prevent the validity of any of the DIP Loan Documents or the right of Borrower to enter into any DIP Loan Document or to consummate the transactions contemplated thereby, (ii) would reasonably be likely to have, either individually or in the aggregate, a Material Adverse Effect, or (iii) would reasonably be likely to result in any Change of Control or other change in the current ownership, control or management of Borrower.

Section 5.06. <u>Compliance with Laws and Agreements</u>. Borrower is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and is not (i) subject to any judgment, order, decree, agreement, document, instrument or restriction which would affect its ability to execute and deliver, or perform under, any DIP Loan Documents or to pay the Obligations when due (other than restrictions the enforcement of which is stayed by virtue of the filing of the Bankruptcy Case or the Financing Orders).

Section 5.07. <u>Intentionally Deleted</u>.

Section 5.08. Intentionally Deleted.

Section 5.09. <u>Titles and Liens</u>. The Borrower has good and absolute title to all Collateral free and clear of all Liens other than Permitted Encumbrances.

Section 5.10.  Intentionally Deleted.

Section 5.11.  <u>Financing Orders.</u>  The Interim Financing Order is, and upon entry of the Final Financing Order, the Final Financing Order shall be, in full force and effect and have not been reversed, vacated, modified, amended or stayed, except for modifications and amendments that are reasonably acceptable to the Lender and are not subject to a pending appeal or stayed in any respect.

Section 5.12.  <u>Location of Collateral.</u>  The Collateral is located at those addresses set forth on **Schedule 5.12** attached hereto and made a part hereof.

Section 5.13.  <u>Accounts.</u>  Unless otherwise disclosed in writing to Lender, (i) each Account of Borrower is genuine in all respects and is what it purports to be, and (ii) all sales or rendering of services of Borrower arises out of sales and services by such Borrower in the ordinary course of business and in accordance with the terms and conditions of all purchase orders, contracts, certifications, participations and other documents relating thereto or forming a part of the contract between Borrower and the Account Debtor.

Section 5.14.  <u>Inventory Warranties.</u>  Unless otherwise indicated in writing to Lender, Borrower (a) has not removed any Inventory from the locations set forth or permitted herein, except for sales of Inventory in the ordinary course of its business; (b) has kept the Inventory in good and marketable condition; and (c) has not permitted Inventory to be subject to any Lien except (i) Liens in favor of Lender pursuant to the DIP Loan Documents and (ii) Permitted Encumbrances.


## ARTICLE VI.
### <u>Affirmative Covenants</u>

Until the termination of this Agreement and full and final payment and satisfaction of the Obligations, Borrower covenants and agrees that:

Section 6.01.  <u>Financial Information.</u>  Borrower will furnish to Lender:  (a) promptly upon, but in no event later than five (5) Business days from, Lender's request therefor, such reports, statements, projections and other documentation and information regarding the operations, business affairs and financial condition of Borrower, or compliance with the terms of this Agreement, as Lender may reasonably request; and (b) within five (5) business days of the delivery thereof, copies of all reports and/or financial information provided to the Bankruptcy Court, any trustee appointed by the Bankruptcy Court and/or any statutorily appointed or ad hoc committee in the Bankruptcy Case.

Section 6.02.  <u>Existence; Name Change.</u>  Borrower will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its Business. Borrower will give Lender at least ten (10) Business Days prior written notice of any proposed change of Borrower's name and will thereafter promptly execute and deliver to

16

Lender such agreements, documents and instruments (including UCC financing statements) reflecting Borrower's new name as Lender shall determine are necessary or desirable in order to maintain the perfection and priority of Lender's Lien on the Collateral.

Section 6.03. <u>Payment of Obligations</u>. Borrower shall make full and timely payments in cash of the principal and interest on the Loan, the Advances and all other Obligations in accordance with the terms of this Agreement and the Loan Note.

Section 6.04. <u>ITC Inventory</u>. Borrower acknowledges and agrees that: (a) the Advances shall be used solely for the purchase of ITC Inventory; (b) all such ITC Inventory shall be of a kind and nature historically used by Borrower in the operation of its Business; (c) all ITC Orders and other documents provided to Lender with each Request for Advance shall be true, accurate and complete, constituting copies of the documentation from ITC pertaining to the ITC Inventory to be acquired with the Advance proceeds; and (d) there shall be no other agreements or arrangements between Borrower and ITC except that which is specifically approved, in writing, by Lender.

Section 6.05. <u>Maintenance of Properties; Insurance</u>. Borrower will (a) keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and (b) maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations, each policy in respect of which shall list Lender as loss payee and/or additional insured as applicable.

Section 6.06. <u>Books and Records; Inspection Rights</u>. Borrower will keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities. Borrower will permit any representatives designated by Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

Section 6.07. <u>Compliance with Laws</u>.   Borrower will comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property.

Section 6.08.  <u>Use of Proceeds</u>.  Borrower shall use the proceeds from the Loan only for the purpose set forth Section 2.04 of this Agreement and as provided in the Financing Orders.

Section 6.09.  <u>Payment of Taxes and Other Claims</u>.  The Borrower will pay or discharge, when due and accruing after the Petition Date: (a) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits or upon any properties belonging to it (including the Collateral), prior to the date on which penalties attach thereto; (b) all federal, state and local taxes required to be withheld by it; and (c) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a Lien upon any properties of the Borrower; provided, that the Borrower shall not be required to pay any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings

17

and for which proper reserves have been made.

Section 6.10.   Inventory Covenants.  With respect to Inventory of Borrower: (a) Borrower shall at all times maintain Inventory records in the same manner as currently maintained, keeping correct and accurate records; (b) Borrower shall not remove any Inventory from the locations set forth on **Schedule 5.12** hereto without the prior written consent of Lender, except for sales of Inventory in the ordinary course of business; (c) Borrower shall produce, use, store and maintain the Inventory with all reasonable care and caution and in accordance with applicable standards of any insurance and in conformity with applicable laws; (d) Borrower shall assume all responsibility and liability arising from or relating to the production, use, sale or other disposition of the Inventory; (e) Borrower shall not sell Inventory to any customer on approval, or any other basis which entitles the customer to return or may obligate Borrower to repurchase such Inventory; (f) Borrower shall keep the Inventory in good and marketable condition; and (g) Borrower shall not, without prior written notice to Lender, acquire or accept any Inventory on consignment.

Section 6.11.   Financing Orders.  Borrower shall at all times comply with all terms and conditions of the Financing Orders.

## ARTICLE VII.
## Negative Covenants

Until the termination of this Agreement and the full and final payment and satisfaction of the Obligations, Borrower covenants and agrees with Lender that:

Section 7.01. Indebtedness. Borrower will not create, incur, assume or permit to exist any Indebtedness, except: (a) the Indebtedness created hereunder, and any future indebtedness of Borrower to Lender;  (b) Indebtedness existing as of the date hereof (including, without limitation, pertaining to the Permitted Encumbrances) as set forth on **Schedule 7.01** attached hereto; and (c) Indebtedness incurred in the ordinary course of business of Borrower.

Section 7.02. Chapter 11 Claims. Borrower shall not incur, create, assume, suffer to exist or permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) which is superior to or pari passu with those granted to Lender by this Agreement or the Financing Orders other than the Carve-outs or those other expenses consented to in writing by Lender.

Section 7.03. Capital Expenditures. Borrower shall not make any capital expenditure without Lender's prior written consent.

Section 7.04. Consent to Amendment of Financing Orders. Borrower shall not seek to amend, supplement or modify any of the terms of the Interim Financing Order or the Final Financing Order without the prior written approval of Lender and then only, in form and substance acceptable to Lender in its sole discretion.

Section 7.05. Other Court Filings and Applications; Indebtedness and Liens. Borrower

18

shall not apply to the Bankruptcy Court for authority to take any action that is prohibited by the terms of any of the DIP Loan Documents or refrain from taking any action required to be taken by the terms of any of the DIP Loan Documents.

Section 7.06.  Permitted Encumbrances.  The Borrower will not create, incur or suffer to exist any Lien upon or of any of its assets, now owned or hereafter acquired, to secure any indebtedness other than the Lien(s) granted to Lender and those Liens set forth on **Schedule 7.06** attached hereto and made a part hereof ("Permitted Encumbrances").

Section 7.07.  Financing Statements.  The Borrower will not amend any financing statements in favor of the Lender except as permitted by law.

Section 7.08.  Guaranties.  Borrower will not assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person, except  (a) the endorsement of negotiable instruments by the Borrower for deposit or collection or similar transactions in the ordinary course of business; and (b) guaranties, endorsements and other direct or contingent liabilities in connection with the obligations of other Persons, in existence on the date hereof.

Section 7.09.  Consolidation and Merger; Asset Acquisitions.  Borrower will not, without the prior written consent of Lender: consolidate with or merge into any Person, or permit any other Person to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all the assets of any other Person; recapitalize; dissolve or liquidate; sell or otherwise transfer all or substantially all of its assets, issue membership or other interests in it to any Person; make any distributions to any of its owners; redeem any interest in it from the owner thereof; or directly or indirectly make any loan to its members or to any Affiliates.

Section 7.10.  Restrictions on Nature of Business.  The Borrower will not engage in any line of business materially different from the Business presently engaged in by the Borrower and will not purchase, lease or otherwise acquire assets not related to its Business.

Section 7.11.  Relocation of Collateral.  Borrower shall not remove any Collateral from the locations set forth on **Schedule 5.12** hereto without the written consent of Lender except for the sale of any such Collateral in the ordinary course of Borrower's Business.

### ARTICLE VIII.
### INTENTIONALLY DELETED

### ARTICLE IX.
### Attorney-In-Fact

Section 9.01.  Attorney-In-Fact.  Borrower hereby constitutes Lender, or any Person Lender may designate, as its attorney-in-fact, at Borrower's cost and expense, to exercise all of the following powers, which being coupled with an interest, shall be irrevocable until all Obligations have been paid in full: (a) to receive, take, endorse, sign, assign and deliver, all in the name of Lender or Borrower, any and all checks, notes, drafts, and other documents or

instruments relating to the Collateral; (b) to receive, open and dispose of all mail addressed to Borrower and to notify postal authorities to change the address for delivery thereof to such address as Lender may designate; (c) to request from customers indebted on Accounts at any time in the name of Lender information concerning the amounts owing on the Accounts; (d) to request from customers indebted on Accounts at any time, in the name of Borrower, in the name of certified public accountant designated by Lender or in the name of Lender's designee, information concerning the amounts owing on the Accounts; (e) to transmit to customers indebted on Accounts notice of Lender's interest therein and to notify customers indebted on Accounts to make payment directly to Lender's for Borrower's account; and (f) to take or bring, in the name of Lender or Borrower, all steps, actions, suits or proceedings deemed by Lender necessary or desirable to enforce or effect collection of the Accounts.

Notwithstanding anything hereinabove contained to the contrary, the powers set forth in (a) through (f) above may only be exercised after the occurrence and during the continuance of an Event of Default, or until such time as such Event of Default is waived in writing by Lender.

### ARTICLE X.
### Events of Default and Remedies

Section 10.01. <u>Events of Default</u>. Each of the following shall be an Event of Default:

(a) Borrower shall fail to pay any amount on the Obligations or provided for in any of the DIP Loan Documents when due, whether on any payment date, on the Maturity Date, by reason of acceleration, by required prepayment or otherwise);

(b) any representation or warranty made or deemed made by or on behalf of Borrower in or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, or in any of the other DIP Loan Documents or other documents furnished pursuant to or in connection with this Agreement shall have been incorrect in any material respect when made or deemed made;

(c) Borrower shall fail to observe or perform any nonpayment covenant, condition or agreement contained herein and the same shall not have been cured within fifteen (15) days of such failure; provided, however, such cure period shall not be available for any Event of Default under Section 6.05;

(d) (i) any of the DIP Loan Documents (other than the Interim Financing Order) ceases to be in full force and effect, or (ii) any Lien created thereunder ceases to constitute a valid perfected Lien on the Collateral having the priority set forth herein and in the Financing Orders in accordance with the terms hereof and thereof;

(e) the Borrower shall liquidate, dissolve, or terminate, or shall suspend or cease its Business operation or otherwise fail to operate its Business in the ordinary course, merge with another Person unless the Borrower is the surviving entity; or sell or attempt to sell all or substantially all of its assets, without the Lender's prior written consent;

(f) (i) the occurrence of a default or event of default under the Guaranty or any other Guaranty Documents; (ii) Guarantor or any other Person signing a guaranty in favor of the Lender shall repudiate, purport to revoke or fail to perform any obligation under such guaranty in favor of the Lender, or (iii) Guarantor shall cease to exist;

(g) the Bankruptcy Court shall not have entered the Financing Orders or the Financing Orders shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court;

(h) the entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than the Lender, to realize upon, or to exercise any right or remedy with respect to, any asset of the Borrower, or to terminate any license, franchise, or similar agreement, where such termination could have a Material Adverse Effect;

(i) without the prior written consent of Lender, an order shall be entered by the Bankruptcy Court in the Bankruptcy Case converting such Bankruptcy Case to a Chapter 7 case;

(j) Borrower files a plan of reorganization or similar filing that fails to provide payment in full of the Obligations of Borrower or which is inconsistent with the terms of the Financing Orders;

(k) an order is entered by the Bankruptcy Court dismissing the Bankruptcy Case which does not contain a provision for termination of this Agreement, and payment in full of all Obligations of Borrower hereunder and under the other DIP Loan Documents prior to entry thereof;

(l) an order is entered by the Bankruptcy Court in the Bankruptcy Case, without the prior written consent of Lender (i) to revoke, reverse, stay, materially modify, supplement or amend the Financing Orders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to Borrower equal or superior to the priority of Lender in respect to the Obligations, or (iii) to grant or permit the grant of a Lien on the Collateral other than Liens granted Lender or a Permitted Encumbrance;

(m) non-compliance by Borrower of any provision of the Financing Orders;

(n) any Change of Control occurs or any agreement or commitment to cause or that may result in any such Change of Control is entered into;

(o) the occurrence of uninsured damage to, or loss, theft or destruction of, any material portion of the Collateral;

(p) any provision of any of the DIP Loan Documents shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against Borrower or Guarantor (as applicable) intended to be a party thereto,

or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by Borrower, Guarantor or any Governmental Authority having jurisdiction over either of them, seeking to establish the invalidity or unenforceability thereof, or Borrower or Guarantor shall deny in writing that it has any liability or obligation purported to be created under any DIP Loan Document; or

(q) the filing of a motion by Borrower in the Bankruptcy Case without the express written consent of Lender, to obtain additional financing from a party other than Lender under Section 363(d) of the Bankruptcy Code or to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code unless the proceeds from such financing or use of cash collateral are used to immediately repay, in cash, the Obligations and this Agreement is terminated.

Section 10.02. Termination of Agreement; Acceleration. Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such event, Lender may, by notice to Borrower, take either or both of the following actions, at the same or different times: (i) terminate this Agreement and thereupon this Agreement shall terminate immediately, and (ii) declare the Loan and all other Obligations then outstanding to be automatically and immediately due and payable in whole (or in part, in which case any principal or other Obligation not so declared to be due and payable may thereafter be declared to be due and payable without further act by Lender and further without further order of, or application to, the Bankruptcy Court), and thereupon the principal of the Loan and all other Obligations so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Borrower.

Section 10.03. Exercise of Remedies. In addition to the acceleration provisions set forth above, upon the occurrence and continuation of an Event of Default, subject to the Financing Orders, Lender shall have the right to exercise any and all rights, options and remedies provided for in the DIP Loan Documents, under the UCC, the Bankruptcy Code, the Financing Orders or at law or in equity. Borrower hereby indemnifies Lender and holds Lender harmless from any and all costs, expenses (including, without limitation, reasonable attorneys' fees), claims, liabilities, or otherwise, incurred or imposed on Lender by reason of the proper exercise of any of its rights, remedies and interests hereunder, absent Lender's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction. The foregoing indemnification shall survive termination of this Agreement until such time as all Obligations (including the foregoing) have been finally and indefeasibly paid in full.

Section 10.04. Rights and Remedies not Exclusive. As between Lender and Borrower, Lender shall have the right in its sole discretion to determine which rights, Liens and/or remedies Lender may at any time pursue, relinquish, subordinate or modify and such determination will not in any way modify or affect any of Lender's rights, Liens or remedies under any DIP Loan Document, the Financing Orders, the Bankruptcy Code, applicable law or equity. The enumeration of any rights and remedies in any DIP Loan Document or the Financing Orders is not intended to be exhaustive, and all rights and remedies of Lender described in any DIP Loan Document or Financing Orders are cumulative and are not alternative to or exclusive

of any other rights or remedies which Lender otherwise may have. The partial or complete exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy.

**ARTICLE XI.**
**Termination**

Section 11.01  Termination.  This Agreement shall terminate on the earlier of (a) the Maturity Date or (b) upon written notice of termination and prepayment of the Loan in full in accordance with Section 2.06 (b) hereof. All Obligations shall become due and payable immediately as of any termination hereof. All of Lender's rights, liens and security interests shall continue after any termination until all Obligations have indefeasibly been paid and satisfied in full.

**ARTICLE XII.**
**Miscellaneous**

Section 12.01.  Notices.  Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)  if to Borrower, to it at:

Kolo Retail, LLC
1224 Mill Street
East Berlin, Connecticut  06023
Attention:_____
Email:_____
Fax:_____

With a copy to:

Halloran & Sage
225 Asylum Street
Hartford, CT 06103
Attn:  Craig I. Lifland, Esq.
Email: Lifland@halloransage.com
Fax: 860-548-0006

(b)  if to Lender, to:

ITO-YA, LTD

23

c/o Andros, Floyd & Miller, P.C.
846 Wethersfield Avenue
Hartford, Connecticut 06114
Attention: Mark LaFontaine, Esq.
Fax:_____
Email: MLafontaine@afmpc.net

With a copy to:

Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Attn: James Berman
Email: jberman@zeislaw.com
Fax: (203)367-9678

(c) Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 12.02. Waivers; Amendments. No failure or delay by Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of Lender hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by Borrower therefrom shall in any event be effective unless the same shall be expressly waived in writing by Lender, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, Lender's failure to exercise any of its rights hereunder shall not be construed as a waiver of any default, regardless of whether Lender may have had notice or knowledge of such default at the time.

Section 12.03. Indemnity; Damage Waiver.

(a) Borrower shall indemnify Lender and its Affiliates of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of transactions contemplated hereby, (ii) the Loan or the use of the proceeds therefrom, or (iii) or any actual claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any

24

Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the negligence or willful misconduct of such Indemnitee.

(b) To the extent permitted by applicable law, Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or the transactions contemplated hereby, the Loan or the use of the proceeds thereof.

(c) All amounts due under this Section shall be payable promptly after written demand therefor.

Section 12.04. <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Lender. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby) any legal or equitable right, remedy or claim under or by reason of this Agreement.

Section 12.05. <u>Further Documents</u>. The Borrower will from time to time execute, deliver, endorse and authorize the filing of any and all instruments, documents, conveyances, assignments, security agreements, financing statements, control agreements and other agreements and writings that the Lender may reasonably request in order to further secure, protect, perfect or enforce Lender's Lien on the Collateral or rights under the DIP Loan Documents.

Section 12.06. <u>Costs and Expenses.</u> The Borrower shall pay, on demand, all costs and expenses, including reasonable attorneys' fees, incurred by the Lender in connection with the Obligations, this Agreement, the DIP Loan Documents and any other document or agreement related hereto or thereto, and the transactions contemplated hereby, including all such costs, expenses and fees incurred in connection with the negotiation, preparation, execution, amendment, administration, performance, collection and enforcement of the Obligations and all such documents and agreements and the creation, perfection, protection, satisfaction, foreclosure or enforcement of the Lender's Liens on the Collateral.

Section 12.07. <u>Survival</u>. All covenants, agreements, representations and warranties made by Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of the Loan, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time it executed this Agreement, and shall continue in full force and effect as long as the principal of or any accrued interest on the Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as this Agreement has not been terminated. Each provision contained in this Agreement pursuant to

25

which Borrower indemnifies, or agrees to be liable for any loss suffered by, Lender, shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loan and the termination of this Agreement or any provision hereof.

Section 12.08. <u>Counterparts; Integration</u>. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of this Agreement or any other DIP Loan Document by telefacsimile or other electronic means shall be equally as effective as delivery of an original executed counterpart of this Agreement or such other DIP Loan Document. Any party delivering an executed counterpart of this Agreement or such other DIP Loan Document by telefacsimile or other electronic means also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement or such other DIP Loan Document. This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

Section 12.09. <u>Severability</u>. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 12.10. <u>Right of Setoff</u>. If an Event of Default shall have occurred and be continuing, Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law and subject to the Financing Orders, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by Lender to or for the credit or the account of Borrower against any of and all the obligations of Borrower now or hereafter existing under this Agreement held by Lender, irrespective of whether or not Lender shall have made any demand under this Agreement and although such obligations may be unmatured. The rights of Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which Lender may have.

Section 12.11. <u>Governing Law.</u> THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CONNECTICUT, WITHOUT REGARD TO THE CONFLICTS OF LAW AND TO THE EXTENT APPLICABLE THE BANKRTUPCY CODE.

Section 12.12. <u>Headings</u>. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 12.13. <u>Interest Rate Limitation</u>. Notwithstanding anything herein to the contrary,

if at any time the interest rate applicable to the Loan, together with all fees, charges and other amounts which are treated as interest on the Loan under applicable law, shall exceed the maximum lawful rate for the State of Connecticut (the "Maximum Rate"), the rate of interest payable in respect of such Loan hereunder, shall be limited to the Maximum Rate.

Section 12.14. <u>Administrative Priority</u>. The Obligations of the Borrower will, at all times after the date hereof, constitute allowed administrative expenses in the Bankruptcy Case, having priority in payment over all other administrative expenses and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code.

Section 12.15. <u>Bankruptcy Court Orders Paramount</u>. In the event of any direct conflict between the terms and conditions of this Agreement (and/or any DIP Loan Document) and the specific terms and conditions of the Financing Orders, the terms and conditions of the Financing Orders shall prevail. Nothing set forth in this Agreement shall require Borrower to act or fail to act in a manner that would violate the Bankruptcy Code or any order of the Bankruptcy Court, without prejudice to Lender's ability to declare the occurrence of an Event of Default based upon such action or failure to act. In the event of any inconsistency between this Agreement and any of the other DIP Loan Documents, this Agreement shall control.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

KOLO RETAIL, LLC, as Borrower

By:_____
Name:
Title:

ITO-YA LTD, as Lender

By:_____
Name: Isamu Suzuki
Title:  Senior Vice President

## EXHIBIT A

## COMMERCIAL PROMISSORY NOTE

$100,000.00                                                Dated as of June __, 2015

FOR VALUE RECEIVED, the undersigned, **KOLO RETAIL, LLC** ("Borrower"), a Connecticut limited liability company doing business in Hartford, Connecticut, promises to pay to the order of **ITO-YA LTD** ("Lender") at its offices at 4F Ginza Fuji Bldg., 1-7-10 Ginza, Chuo-ku, Tokyo, 104-0061 Japan, in lawful money of the United States of America and in immediately available funds, the principal amount of ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($100,000.00) or such lesser amount as may at any time be the aggregate unpaid principal balance of all Advances made by the Lender to Borrower under the Loan Agreement (defined below), together with all interest on the unpaid principal amount owing hereunder from time to time, from the date hereof until this Note is fully paid, when and at the rate specified in Article II of the Loan Agreement, together with all taxes assessed upon said sum against the holder of this Note ("Holder"), all amounts which may be or become due under the Loan Agreement or under any other document securing the indebtedness evidenced by this Note and any costs and expenses including, without limitation, reasonable attorneys' fees, incurred in collection of this Note or in protecting or sustaining the lien of the same or in any litigation or controversy arising from or connected with this Note, the Loan Agreement or the DIP Loan Documents (as defined in the Loan Agreement). This Note is subject to (a) the terms of that certain Post-Petition Loan and Security Agreement by and between Borrower and Lender and dated effective as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time hereafter, the "Loan Agreement"), and (b) all applicable orders of the Bankruptcy Court in, and Bankruptcy Code provisions pertaining to, the Bankruptcy Case. All capitalized terms used herein shall have the meanings ascribed to them in the Loan Agreement, unless otherwise defined herein.

Principal and interest due hereunder shall be payable as provided in the Loan Agreement, and this Note may be prepaid only in accordance with the terms of the Loan Agreement. If any payment of this Note becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day.

Upon the occurrence of any Event of Default specified in the Loan Agreement or upon the Maturity Date the principal balance outstanding hereunder shall bear interest at the Default Rate.

Further, upon the earlier of occurrence of an Event of Default or the Maturity Date, all amounts then remaining unpaid under this Note may become, or be declared to be, immediately due and payable as provided in the Loan Agreement. Borrower hereby expressly waives presentment or other demand for payment, notice of dishonor and protest.

This Note is secured by, among other things, the security interests granted pursuant to the Loan Agreement and the Security Documents (as defined in the Loan Agreement), and may now or hereafter be secured by one or more other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements.

The Borrower shall pay all costs of collection, including reasonable attorneys' fees and legal expenses if this Note is not paid when due, whether or not legal proceedings are commenced.

The Borrower waives diligence, demand, presentment for payment, notice of nonpayment, protest and notice of protest, and notice of any renewals or extensions of this note, and all rights under any statute of limitations.

THE MAKER HEREBY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO OR RELATING TO THIS NOTE OR ANY OF THE DIP LOAN DOCUMENTS, INCLUDING THE ENFORCEMENT OF RIGHTS AND REMEDIES WITH RESPECT TO THIS NOTE OR ANY OF THE DIP LOAN DOCUMENTS. THE MAKER ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY.

This Note shall be governed by and construed in accordance with the laws of the State of Connecticut.

KOLO RETAIL, LLC

By:_____
Name:
Title:  Chief Executive Officer

## EXHIBIT B

### GUARANTY AGREEMENT

**THIS GUARANTY AGREEMENT** (this "Guaranty Agreement") is dated as of the ____ day of June, 2015, by **KOLO, LLC**, a Delaware limited liability company with its principal place of business at 241 Asylum Street, Hartford, Connecticut 06103 ("Guarantor") in favor of **ITO-YA LTD**, having an office at 4F Ginza Fuji Bldg., 1-7-10 Ginza, Chuo-ku, Tokyo, 104-0061 Japan ("Lender").

### W I T N E S S E T H:

**WHEREAS,** on June 29, 2015, KOLO RETAIL, LLC ("Borrower") commenced a case (the "Bankruptcy Case") under Chapter 11 of Title 11, United States Code, as amended ("Bankruptcy Code") in the United States Bankruptcy Court for the District of Connecticut ("Bankruptcy Court") and is continuing to operate its business and manage its properties as debtor and debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS,** Borrower has requested, subject to approval by the Bankruptcy Court, that Lender extend a line of credit facility to Borrower to fund Borrower's acquisition of certain inventory as set forth in the Loan Agreement (defined below); and

**WHEREAS,** the Lender is about to extend such a line of credit in the aggregate amount not to exceed One Hundred Thousand and 00/100 ($100,000.00) Dollars ("Loan") to Borrower pursuant to a Post-Petition Loan and Security Agreement by and between the Lender and the Borrower of even date herewith ("Loan Agreement") and evidenced by a Commercial Promissory Note from Borrower to Lender in said amount dated as of the date hereof ("Note"); and

**WHEREAS,** the Lender, as a condition to granting the Loan, has required that the Loan and Borrower's obligations therefor be unconditionally guaranteed by Guarantor pursuant to this Guaranty Agreement and that said guaranty be secured by a security interest in all of Guarantor's assets.

**NOW, THEREFORE,** in order to induce Lender to extend the Loan, and in consideration therefor, and for the other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the Guarantor hereby unconditionally and irrevocably guarantees to Lender the due and punctual payment of the principal of, and all interest and other amounts accruing under the Loan Agreement and Note, and under any other instrument, document or agreement executed or entered into in connection with the Loan (hereinafter collectively referred to as the "Indebtedness"), when the same shall become due and payable whether at maturity, by acceleration or otherwise, including any portion of Indebtedness nominally held by the Lender on behalf of others who have participations or interests therein granted or created by the Lender whether direct or contingent, due or to become due, now existing or hereafter arising, and whether created directly or acquired by assignment or otherwise by the Lender.  Upon a default or Event of Default under the Note, the Loan Agreement, Security

Agreement (defined below) and/or any other document, agreement or instrument executed in connection with the Loan, as may be amended from time to time (collectively, the "Loan Documents"), the Indebtedness and any portion thereof shall be immediately payable by the Guarantor upon demand by the Lender, and Guarantor's obligations hereunder shall not be contingent upon the exercise or enforcement by Lender of any remedies it may have against the Borrower, any other guarantors or sureties, or the enforcement of any lien or the realization upon any collateral Lender may at any time possess.

Guarantor hereby waives: notice of acceptance hereof; notice of the extension of credit or the making of advances under the Loan from time to time by Lender to the Borrower and the creation, existence or acquisition of any Indebtedness hereby guaranteed; notice of the amount of the Indebtedness or any other indebtedness of the Borrower to the Lender from time to time outstanding, subject, however, to Guarantor's right to make written inquiry of Lender to ascertain the amount of Indebtedness at any reasonable time; notice of adverse change in the Borrower's financial condition or of any other fact which might otherwise require notice thereof; and all other notices and demands to which the Guarantor might otherwise be entitled. Guarantor further waives rights by statute or otherwise to require Lender to institute suit against the Borrower or any other guarantor of the obligations guaranteed hereby or to exhaust its right and remedies against the Borrower or any other such guarantor. Guarantor is bound to the payment of all the Indebtedness owed to Lender as fully as if such Indebtedness were directly owing to Lender by the Guarantor. Guarantor further waives any defense arising by reason of any disability or other defense of the Borrower or by reason of the cessation from any cause whatsoever of the liability of the Borrower. Until all of the Indebtedness shall have been paid in full, no Guarantor shall have and hereby waives any claim, remedy or right which Guarantor may now have or hereafter acquire, that arises hereunder and/or from the performance by Guarantor hereunder, including, without limitation, any claim, right or remedy of subrogation, contribution, reimbursement, exoneration, indemnification or participation in any claim, right or remedy of Lender against the Borrower or any security which Lender now has or hereafter acquires (collectively, the "Collateral") whether such claim arises in equity, under contract, common law, statute or otherwise. Nothing shall discharge or satisfy the liability of the Guarantor hereunder except the full and final payment of all the Indebtedness. All Indebtedness shall, at Lender's option, become immediately due and payable if (a) Guarantor defaults under any of its obligations hereunder or under the Security Agreement or (b) a default or Event of Default (as defined therein) shall have occurred under the Loan Agreement or under any of the other Loan Documents.

Guarantor has, pursuant to that certain Security Agreement dated April 23, 2015 ("Security Agreement"), granted Lender a security interest in all of Guarantor's assets to secure any and all liabilities and obligations of Guarantor to Lender whenever and however arising, whether then existing or thereafter arising, due or to become due, direct or indirect, primary or secondary, absolute or contingent, and, accordingly secures, among other obligations, all obligations of Guarantor hereunder relating to the Indebtedness or the Loan . In addition, Guarantor hereby grants to the Lender a lien upon, security interest in, and, where applicable, right of set-off against, any and all deposits, credits and any and all other interest in any kind of property or asset, whether real, personal or mixed, tangible or intangible, of the Guarantor, now or at any time whatsoever with, or in the possession of, the Lender, or in transit to the Lender, as

security for any and all obligations of the Guarantor to the Lender or relating to the Indebtedness or the Loan.

Guarantor consents and agrees that, without notice to it and without affecting or impairing its obligations hereunder, Lender may, by action or inaction: compromise, settle, extend the time for payment of the Indebtedness with the Borrower or any party liable therefore; release the Borrower or any party from its liability for the Indebtedness; modify any instrument or agreement relating to the Indebtedness (except this Guaranty Agreement and the Security Agreement) or the Collateral; extend the time for making any deposit or granting a security interest in the Collateral; refuse or fail to enforce its rights under or perfect its security interest pursuant to any agreement or instrument evidencing or securing the Indebtedness; or waive or modify the obligation of, or extend the time for performance of, any party obligated to perform under the Loan Documents.

Guarantor agrees that the Lender shall be under no obligation to marshal any assets in favor of the Guarantor, or against or in payment of any or all of the Indebtedness. Guarantor agrees to pay all expenses incurred by Lender in connection with an Event of Default, including without limitation, the evaluation, protection, assertion or enforcement of its rights under this Guaranty Agreement, and attorney's fees and disbursements. Guarantor further agrees that to the extent the Borrower makes a payment or payments to Lender, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required, for any of the foregoing reasons or for any other reason, to be repaid or paid over to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common law or rule of equity, then to the extent of such payment or repayment, the Indebtedness or part thereof intended to be satisfied shall be revived and continued in full force and effect as if said payment had not been made and Guarantor shall be again primarily liable therefor under this Guaranty Agreement.

Guarantor hereby agrees that immediately upon the occurrence of an Event of Default, any and all present and future debts and obligations of the Borrower to the Guarantor will automatically and without the necessity of any further action by the Guarantor be waived and postponed in favor of, and subordinated to the full payment of, the Indebtedness. As security for this Guaranty Agreement and its obligations hereunder, Guarantor hereby collaterally assigns to Lender all claims of any nature which they may now or hereafter have acquired against the Borrower.

Guarantor represents, warrants and covenants to Lender, as an inducement to Lender to grant credit and extend Advances (as defined in the Loan Agreement) to the Borrower, as follows: Guarantor is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware; is duly authorized to do business in all other states in which it is conducting business has the power and authority to own its own properties and assets; has the right and power and is duly authorized and empowered to enter into, execute, deliver and perform this Guaranty Agreement and all documents and instruments related thereto; and as of the date of this Guaranty Agreement, the fair salable value of Guarantor's assets exceeds its liabilities and the Guarantor is meeting current liabilities as they mature. Guarantor shall immediately give Lender written notice of any material adverse changes in its financial

condition and shall furnish financial statements to Lender in such form and at such times as are required under the Security Agreement. The Guarantor shall also provide the Lender or its representatives with such other data and information as Lender from time to time may reasonably request and bearing upon or related to its financial condition.

This Guaranty Agreement is a primary and original obligation of the Guarantor and is an absolute, unconditional, continuing and irrevocable guaranty of payment and shall remain in full force and effect without respect to future changes and conditions, including change of law or any invalidity or irregularity with respect to the execution and delivery of any agreement between the Borrower and Lender, including without limitation, the Loan Documents. This Guaranty Agreement is in addition to, and not in substitution for, or in reduction of, any other guaranty by the Guarantor in favor of Lender.

No election to proceed in one form of action or proceeding, or against any party, or on any obligation, shall constitute a waiver of Lender's right to proceed in any other form of action or proceeding or against any other parties unless Lender has expressly waived such right in writing. Specifically, but without limiting the generality of the foregoing, no action or proceeding by Lender against Borrower, Guarantor or any other party under any other document evidencing or securing the Indebtedness shall serve to diminish the liability of Guarantor except to the extent Lender fully and unconditionally realized payment by such action or proceeding, notwithstanding the effect of any such action or proceeding upon Guarantor's right of subrogation or contribution against the Borrower or any other party. Guarantor is fully aware of the financial condition of the Borrower. Guarantor is executing and delivering this Guaranty Agreement based solely upon its own independent investigation and in no part upon any representation or statement of Lender with respect thereto. Guarantor is in a position to obtain and hereby assumes full responsibility for obtaining, any additional information concerning the Borrower's financial condition as it may deem material to its obligations hereunder, and it is not relying upon, nor expecting Lender to furnish any information in Lender's possession concerning he Borrower's financial condition. Guarantor hereby knowingly accepts the full range of risk encompassed within a contract of "continuing guaranty" which risk includes, but without limitation, the possibility that Borrower will contract additional indebtedness pursuant to the Loan for which Guarantor will be responsible hereunder after Borrower's financial condition or ability to pay its lawful debts when they fall due has deteriorated.

Guarantor agrees that all rights, benefit and privileges herein and hereby conferred upon Lender shall vest in, and be enforceable by, Lender, its successors and assigns. Guarantor agrees that this Guaranty Agreement shall bind its successors and assigns.

This Guaranty Agreement, all acts and transactions hereunder and the rights and obligations of the parties hereto shall be governed by, and construed and enforced in accordance with, the laws of the State of Connecticut. As part of the consideration for Lender's entering into the Loan, the Guarantor hereby agrees that all actions or proceedings arising directly or indirectly hereunder may, at the option of Lender, be litigated in courts having situs within the State of Connecticut, and the Guarantor hereby expressly consents to the jurisdiction of any local, state or federal court located within said state, and consents that any service of process in such action or proceeding may be made by personal service upon it or them wherever it or they

may be them located, or by service as provided by law directed toward the Guarantor, at its last known address.

### WAIVER OF JURY TRIAL AND NOTICE OF HEARING

**GUARANTOR HEREBY WAIVES TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THIS GUARANTY OR THE SECURITY AGREEMENT AND/OR THE ENFORCEMENT OF ANY OF THE LENDER'S RIGHTS. GUARANTOR ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.**

**GUARANTOR HEREBY ACKNOWLEDGES THAT THE TRANSACTION OF WHICH THIS GUARANTY IS A PART IS A COMMERCIAL TRANSACTION, AND TO THE EXTENT ALLOWED UNDER CONNECTICUT GENERAL STATUTES SECTIONS 52-278A TO 52-278N, INCLUSIVE, OR BY OTHER APPLICABLE LAW, HEREBY WAIVES ITS RIGHT TO NOTICE AND HEARING WITH RESPECT TO ANY PREJUDGMENT REMEDY WHICH LENDER OR ITS SUCCESSORS OR ASSIGNS MAY DESIRE TO USE, AND FURTHER WAIVES ITS RIGHTS TO REQUEST THAT THE LENDER POST A BOND, WITH OR WITHOUT SECURITY, TO PROTECT THE GUARANTOR AGAINST DAMAGES THAT MAY BE CAUSED BY ANY PREJUDGMENT REMEDY SOUGHT OR OBTAINED BY THE LENDER. GUARANTOR AUTHORIZES LENDER'S ATTORNEY TO ISSUE A WRIT FOR A PREJUDGMENT REMEDY WITHOUT COURT ORDER, PROVIDED THE COMPLAINT SHALL SET FORTH A COPY OF THIS WAIVER. GUARANTOR ACKNOWLEDGES AND STIPULATES THAT THE ABOVE WAIVER AND AUTHORIZATION ARE GRANTED KNOWINGLY AND FREELY AFTER FULL CONSULTATION WITH COMPETENT COUNSEL AND UNDERSTANDS THAT THE EXERCISE OF LENDER'S RIGHT DESCRIBED ABOVE MAY RESULT IN THE ATTACHMENT OR LEVY AGAINST GUARANTOR'S PROPERTY WITHOUT PRIOR APPROVAL OR SCRUTINY OF A COURT OF LAW.**

Any attempted revocation of this Guaranty Agreement by Guarantor shall be ineffective unless otherwise expressly provided by law and, if applicable law provides that such revocation is effective, such revocation shall be effective only as to Indebtedness which may thereafter become due and owing to Lender and shall not effect the continuing liability hereunder of the Guarantor for all Indebtedness theretofore incurred by, accrued on account of, or arising in respect of, Borrower.

Notwithstanding anything herein to the contrary, in the event that any of the terms or conditions of this Guaranty Agreement directly conflict with the Financing Orders (as defined in

the Loan Agreement) entered by the Bankruptcy Court in Borrower's Bankruptcy Case, the terms and conditions of the Financing Orders shall control and this Guaranty Agreement shall be deemed amended accordingly.

**IN WITNESS WHEREOF,** Guarantor has caused its duly authorized representative to execute this Guaranty Agreement effective as of the day and year first above written.

KOLO, LLC

By:_____

Name: Peter G. Dunn

Title: Chief Executive Officer

## SCHEDULE 4.01

### Collateral

All of Borrower's assets, including all of the following Property and interests in Property of Borrower, whether now owned or existing or hereafter created, acquired or arising and wheresoever located:

| | |
|---|---|
| **(i)** | Accounts; |
| **(ii)** | Certificated Securities; |
| **(iii)** | Chattel Paper; |
| **(iv)** | Commercial Tort Claims; |
| **(v)** | Computer Hardware and Software and all rights with respect thereto, including, any and all licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing; |
| **(vi)** | Contract Rights; |
| **(vii)** | Deposit Accounts; |
| **(viii)** | Documents; |
| **(ix)** | Equipment; |
| **(x)** | Financial Assets; |
| **(xi)** | Fixtures; |
| **(xii)** | General Intangibles, including Payment Intangibles and Software; |
| **(xiii)** | Goods (including all of its Equipment, Fixtures and Inventory), and all accessions, additions, attachments, improvements, substitutions and replacements thereto and therefore; |
| **(xiv)** | Instruments; |
| **(xv)** | Intellectual Property; |
| **(xvi)** | Inventory; |

(xvii)   Investment Property;

(xviii)  money (of every jurisdiction whatsoever);

(xix)    Letter-of-Credit Rights;

(xx)     Payment Intangibles;

(xxi)    Security Entitlements;

(xxii)   Software;

(xxiii)  Supporting Obligations;

(xxiv)   Uncertificated Securities;

(xxv)    all real property, including, without limitation any leasehold interest in real property; and

(xxvi)   to the extent not included in the foregoing, all other personal property of any kind or description;

together with all books, records, writings data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to any of the foregoing,  and all Proceeds, products, offspring, rents, issues, profits and returns of and from any of the foregoing; provided that to the extent that the provisions of any lease or license of Computer Hardware and Software or Intellectual Property expressly prohibit (which prohibition is enforceable under applicable law) any assignment thereof, and the grant of a security interest therein, Lender will not enforce its security interest in Borrower's rights under such lease or license (other than in respect of the Proceeds thereof) for so long as such prohibition continues, it being understood that upon request of Lender, Borrower will in good faith use reasonable efforts to obtain consent for the creation of a security interest in favor of Lender (and to Lender's enforcement of such security interest) in such Lender's rights under such lease or license.

For the purposes of this Schedule 4.01, capitalized terms shall have the following definitions:

(a) the terms **Account, Certificated Security, Commercial Tort Claims, Chattel Paper, Deposit Account, Document, Equipment, Financial Asset, Fixture, General Intangibles, Goods, Instrument, Inventory, Investment Property, Letter-of-Credit Rights, Payment Intangibles, Security Entitlement, Software, Supporting Obligations, and Uncertificated Security** have the respective meanings assigned thereto in the UCC (as defined below); and

(b) the following terms shall have the following meanings (terms defined in the singular to have the same meaning when used in the plural and vice versa):

**Computer Hardware and Software** – all of the Borrower's rights (including rights as licensee and lessee) with respect to **(i)** computer and other electronic data processing hardware, including all integrated computer systems, central processing units, memory units, display terminals, printers, computer elements, card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories, peripheral devices and other related computer hardware; **(ii)** all Software and all software programs designed for use on the computers and electronic data processing hardware described in **clause (i)** above, including all operating system software, utilities and application programs in any form (source code listings whatsoever); **(iii)** any firmware associated with any of the foregoing; and **(iv)** any documentation for hardware, Software and firmware described in **clauses (i), (ii)and (iii)** above, including flow charts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes.

**Contract Right** – any right of Borrower to payment under a contract for the sale or lease of goods or the rendering of services, which right is at the time not yet earned by performance.

**Intellectual Property** – all past, present and future: trade secrets, know-how and other proprietary information; trademarks, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and the goodwill of the business relating thereto and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights (including copyrights for computer programs) and copyright registrations or applications for registrations which have heretofore been or may hereafter be issued throughout the world and all tangible property embodying the copyrights, unpatented inventions (whether or not patentable); patent applications and patents; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writing, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases, and other physical manifestations, embodiments or incorporations of any of the foregoing; the right to sue for all past, present and future infringements of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

**Property** – any interest in any kind of personal property or asset, tangible or intangible.

**Schedule 5.12**
**Location of Collateral**

**Schedule 7.01**
**Existing Indebtedness**

## Schedule 7.06
## Permitted Encumbrances

1.      Lien by the Town of Windsor Tax Collector's Office filed with the Connecticut Secretary of State on May 30, 2014 (Filing #0002998135) against Kolo Retail, LLC.

2.      Lien by the City of Hartford Tax Collector filed with the Connecticut Security of State on June 18, 2010 (Filing #0002759805) against Kolo, LLC.

3.      Attachment by Cast Iron Associates.  No recording with Secretary of State.

# EXHIBIT A

## COMMERCIAL PROMISSORY NOTE

$100,000.00                                                    Dated as of June __, 2015

FOR VALUE RECEIVED, the undersigned, **KOLO RETAIL, LLC** ("Borrower"), a Connecticut limited liability company doing business in Hartford, Connecticut, promises to pay to the order of **ITO-YA LTD** ("Lender") at its offices at 4F Ginza Fuji Bldg., 1-7-10 Ginza, Chuo-ku, Tokyo, 104-0061 Japan, in lawful money of the United States of America and in immediately available funds, the principal amount of ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($100,000.00) or such lesser amount as may at any time be the aggregate unpaid principal balance of all Advances made by the Lender to Borrower under the Loan Agreement (defined below), together with all interest on the unpaid principal amount owing hereunder from time to time, from the date hereof until this Note is fully paid, when and at the rate specified in Article II of the Loan Agreement, together with all taxes assessed upon said sum against the holder of this Note ("Holder"), all amounts which may be or become due under the Loan Agreement or under any other document securing the indebtedness evidenced by this Note and any costs and expenses including, without limitation, reasonable attorneys' fees, incurred in collection of this Note or in protecting or sustaining the lien of the same or in any litigation or controversy arising from or connected with this Note, the Loan Agreement or the DIP Loan Documents (as defined in the Loan Agreement). This Note is subject to (a) the terms of that certain Post-Petition Loan and Security Agreement by and between Borrower and Lender and dated effective as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time hereafter, the "Loan Agreement"), and (b) all applicable orders of the Bankruptcy Court in, and Bankruptcy Code provisions pertaining to, the Bankruptcy Case. All capitalized terms used herein shall have the meanings ascribed to them in the Loan Agreement, unless otherwise defined herein.

Principal and interest due hereunder shall be payable as provided in the Loan Agreement, and this Note may be prepaid only in accordance with the terms of the Loan Agreement. If any payment of this Note becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day.

Upon the occurrence of any Event of Default specified in the Loan Agreement or upon the Maturity Date the principal balance outstanding hereunder shall bear interest at the Default Rate.

Further, upon the earlier of occurrence of an Event of Default or the Maturity Date, all amounts then remaining unpaid under this Note may become, or be declared to be, immediately due and payable as provided in the Loan Agreement. Borrower hereby expressly waives presentment or other demand for payment, notice of dishonor and protest.

This Note is secured by, among other things, the security interests granted pursuant to the Loan Agreement and the Security Documents (as defined in the Loan Agreement), and may now

or hereafter be secured by one or more other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements.

The Borrower shall pay all costs of collection, including reasonable attorneys' fees and legal expenses if this Note is not paid when due, whether or not legal proceedings are commenced.

The Borrower waives diligence, demand, presentment for payment, notice of nonpayment, protest and notice of protest, and notice of any renewals or extensions of this note, and all rights under any statute of limitations.

THE MAKER HEREBY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO OR RELATING TO THIS NOTE OR ANY OF THE DIP LOAN DOCUMENTS, INCLUDING THE ENFORCEMENT OF RIGHTS AND REMEDIES WITH RESPECT TO THIS NOTE OR ANY OF THE DIP LOAN DOCUMENTS. THE MAKER ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY.

This Note shall be governed by and construed in accordance with the laws of the State of Connecticut.

KOLO RETAIL, LLC

By:_____

Name:

Title:  Chief Executive Officer

# EXHIBIT B

## GUARANTY AGREEMENT

**THIS GUARANTY AGREEMENT** (this "Guaranty Agreement") is dated as of the _____ day of June, 2015, by **KOLO, LLC**, a Delaware limited liability company with its principal place of business at 241 Asylum Street, Hartford, Connecticut 06103 ("Guarantor") in favor of **ITO-YA LTD**, having an office at 4F Ginza Fuji Bldg., 1-7-10 Ginza, Chuo-ku, Tokyo, 104-0061 Japan ("Lender").

## W I T N E S S E T H:

**WHEREAS,** on June 29, 2015, KOLO RETAIL, LLC ("Borrower") commenced a case (the "Bankruptcy Case") under Chapter 11 of Title 11, United States Code, as amended ("Bankruptcy Code") in the United States Bankruptcy Court for the District of Connecticut ("Bankruptcy Court") and is continuing to operate its business and manage its properties as debtor and debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS,** Borrower has requested, subject to approval by the Bankruptcy Court, that Lender extend a line of credit facility to Borrower to fund Borrower's acquisition of certain inventory as set forth in the Loan Agreement (defined below); and

**WHEREAS,** the Lender is about to extend such a line of credit in the aggregate amount not to exceed One Hundred Thousand and 00/100 ($100,000.00) Dollars ("Loan") to Borrower pursuant to a Post-Petition Loan and Security Agreement by and between the Lender and the Borrower of even date herewith ("Loan Agreement") and evidenced by a Commercial Promissory Note from Borrower to Lender in said amount dated as of the date hereof ("Note"); and

**WHEREAS,** the Lender, as a condition to granting the Loan, has required that the Loan and Borrower's obligations therefor be unconditionally guaranteed by Guarantor pursuant to this Guaranty Agreement and that said guaranty be secured by a security interest in all of Guarantor's assets.

**NOW, THEREFORE,** in order to induce Lender to extend the Loan, and in consideration therefor, and for the other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the Guarantor hereby unconditionally and irrevocably guarantees to Lender the due and punctual payment of the principal of, and all interest and other amounts accruing under the Loan Agreement and Note, and under any other instrument, document or agreement executed or entered into in connection with the Loan (hereinafter collectively referred to as the "Indebtedness"), when the same shall become due and payable whether at maturity, by acceleration or otherwise, including any portion of Indebtedness nominally held by the Lender on behalf of others who have participations or interests therein granted or created by the Lender whether direct or contingent, due or to become due, now existing or hereafter arising, and whether created directly or acquired by assignment or otherwise by the Lender. Upon a default or Event of Default under the Note, the Loan Agreement, Security Agreement (defined below) and/or any other document, agreement or instrument executed in

connection with the Loan, as may be amended from time to time (collectively, the "Loan Documents"), the Indebtedness and any portion thereof shall be immediately payable by the Guarantor upon demand by the Lender, and Guarantor's obligations hereunder shall not be contingent upon the exercise or enforcement by Lender of any remedies it may have against the Borrower, any other guarantors or sureties, or the enforcement of any lien or the realization upon any collateral Lender may at any time possess.

Guarantor hereby waives:  notice of acceptance hereof; notice of the extension of credit or the making of advances under the Loan from time to time by Lender to the Borrower and the creation, existence or acquisition of any Indebtedness hereby guaranteed; notice of the amount of the Indebtedness or any other indebtedness of the Borrower to the Lender from time to time outstanding, subject, however, to Guarantor's right to make written inquiry of Lender to ascertain the amount of Indebtedness at any reasonable time; notice of adverse change in the Borrower's financial condition or of any other fact which might otherwise require notice thereof; and all other notices and demands to which the Guarantor might otherwise be entitled.  Guarantor further waives rights by statute or otherwise to require Lender to institute suit against the Borrower or any other guarantor of the obligations guaranteed hereby or to exhaust its right and remedies against the Borrower or any other such guarantor.  Guarantor is bound to the payment of all the Indebtedness owed to Lender as fully as if such Indebtedness were directly owing to Lender by the Guarantor.  Guarantor further waives any defense arising by reason of any disability or other defense of the Borrower or by reason of the cessation from any cause whatsoever of the liability of the Borrower.  Until all of the Indebtedness shall have been paid in full, no Guarantor shall have and hereby waives any claim, remedy or right which Guarantor may now have or hereafter acquire, that arises hereunder and/or from the performance by Guarantor hereunder, including, without limitation, any claim, right or remedy of subrogation, contribution, reimbursement, exoneration, indemnification or participation in any claim, right or remedy of Lender against the Borrower or any security which Lender now has or hereafter acquires (collectively, the "Collateral") whether such claim arises in equity, under contract, common law, statute or otherwise.  Nothing shall discharge or satisfy the liability of the Guarantor hereunder except the full and final payment of all the Indebtedness.  All Indebtedness shall, at Lender's option, become immediately due and payable if (a) Guarantor defaults under any of its obligations hereunder or under the Security Agreement or (b) a default or Event of Default (as defined therein) shall have occurred under the Loan Agreement or under any of the other Loan Documents.

Guarantor has, pursuant to that certain Security Agreement dated April 23, 2015 ("Security Agreement"), granted Lender a security interest in all of Guarantor's assets to secure any and all liabilities and obligations of Guarantor to Lender whenever and however arising, whether then existing or thereafter arising, due or to become due, direct or indirect, primary or secondary, absolute or contingent, and, accordingly secures, among other obligations,  all obligations of Guarantor hereunder relating to the Indebtedness or the Loan .  In addition, Guarantor hereby grants to the Lender a lien upon, security interest in, and, where applicable, right of set-off against, any and all deposits, credits and any and all other interest in any kind of property or asset, whether real, personal or mixed, tangible or intangible, of the Guarantor, now or at any time whatsoever with, or in the possession of, the Lender, or in transit to the Lender, as

security for any and all obligations of the Guarantor to the Lender or relating to the Indebtedness or the Loan.

Guarantor consents and agrees that, without notice to it and without affecting or impairing its obligations hereunder, Lender may, by action or inaction:  compromise, settle, extend the time for payment of the Indebtedness with the Borrower or any party liable therefore; release the Borrower or any party from its liability for the Indebtedness; modify any instrument or agreement relating to the Indebtedness (except this Guaranty Agreement and the Security Agreement) or the Collateral; extend the time for making any deposit or granting a security interest in the Collateral; refuse or fail to enforce its rights under or perfect its security interest pursuant to any agreement or instrument evidencing or securing the Indebtedness; or waive or modify the obligation of, or extend the time for performance of, any party obligated to perform under the Loan Documents.

Guarantor agrees that the Lender shall be under no obligation to marshal any assets in favor of the Guarantor, or against or in payment of any or all of the Indebtedness.  Guarantor agrees to pay all expenses incurred by Lender in connection with an Event of Default, including without limitation, the evaluation, protection, assertion or enforcement of its rights under this Guaranty Agreement, and attorney's fees and disbursements. Guarantor further agrees that to the extent the Borrower makes a payment or payments to Lender, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required, for any of the foregoing reasons or for any other reason, to be repaid or paid over to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common law or rule of equity, then to the extent of such payment or repayment, the Indebtedness or part thereof intended to be satisfied shall be revived and continued in full force and effect as if said payment had not been made and Guarantor shall be again primarily liable therefor under this Guaranty Agreement.

Guarantor hereby agrees that immediately upon the occurrence of an Event of Default, any and all present and future debts and obligations of the Borrower to the Guarantor will automatically and without the necessity of any further action by the Guarantor be waived and postponed in favor of, and subordinated to the full payment of, the Indebtedness.  As security for this Guaranty Agreement and its obligations hereunder, Guarantor hereby collaterally assigns to Lender all claims of any nature which they may now or hereafter have acquired against the Borrower.

Guarantor represents, warrants and covenants to Lender, as an inducement to Lender to grant credit and extend Advances (as defined in the Loan Agreement) to the Borrower, as follows:  Guarantor is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware; is duly authorized to do business in all other states in which it is conducting business has the power and authority to own its own properties and assets; has the right and power and is duly authorized and empowered to enter into, execute, deliver and perform this Guaranty Agreement and all documents and instruments related thereto; and as of the date of this Guaranty Agreement, the fair salable value of Guarantor's assets exceeds its liabilities and the Guarantor is meeting current liabilities as they mature. Guarantor

shall immediately give Lender written notice of any material adverse changes in its financial condition and shall furnish financial statements to Lender in such form and at such times as are required under the Security Agreement. The Guarantor shall also provide the Lender or its representatives with such other data and information as Lender from time to time may reasonably request and bearing upon or related to its financial condition.

This Guaranty Agreement is a primary and original obligation of the Guarantor and is an absolute, unconditional, continuing and irrevocable guaranty of payment and shall remain in full force and effect without respect to future changes and conditions, including change of law or any invalidity or irregularity with respect to the execution and delivery of any agreement between the Borrower and Lender, including without limitation, the Loan Documents. This Guaranty Agreement is in addition to, and not in substitution for, or in reduction of, any other guaranty by the Guarantor in favor of Lender.

No election to proceed in one form of action or proceeding, or against any party, or on any obligation, shall constitute a waiver of Lender's right to proceed in any other form of action or proceeding or against any other parties unless Lender has expressly waived such right in writing. Specifically, but without limiting the generality of the foregoing, no action or proceeding by Lender against Borrower, Guarantor or any other party under any other document evidencing or securing the Indebtedness shall serve to diminish the liability of Guarantor except to the extent Lender fully and unconditionally realized payment by such action or proceeding, notwithstanding the effect of any such action or proceeding upon Guarantor's right of subrogation or contribution against the Borrower or any other party. Guarantor is fully aware of the financial condition of the Borrower. Guarantor is executing and delivering this Guaranty Agreement based solely upon its own independent investigation and in no part upon any representation or statement of Lender with respect thereto. Guarantor is in a position to obtain and hereby assumes full responsibility for obtaining, any additional information concerning the Borrower's financial condition as it may deem material to its obligations hereunder, and it is not relying upon, nor expecting Lender to furnish any information in Lender's possession concerning he Borrower's financial condition. Guarantor hereby knowingly accepts the full range of risk encompassed within a contract of "continuing guaranty" which risk includes, but without limitation, the possibility that Borrower will contract additional indebtedness pursuant to the Loan for which Guarantor will be responsible hereunder after Borrower's financial condition or ability to pay its lawful debts when they fall due has deteriorated.

Guarantor agrees that all rights, benefit and privileges herein and hereby conferred upon Lender shall vest in, and be enforceable by, Lender, its successors and assigns. Guarantor agrees that this Guaranty Agreement shall bind its successors and assigns.

This Guaranty Agreement, all acts and transactions hereunder and the rights and obligations of the parties hereto shall be governed by, and construed and enforced in accordance with, the laws of the State of Connecticut. As part of the consideration for Lender's entering into the Loan, the Guarantor hereby agrees that all actions or proceedings arising directly or indirectly hereunder may, at the option of Lender, be litigated in courts having situs within the State of Connecticut, and the Guarantor hereby expressly consents to the jurisdiction of any local, state or

federal court located within said state, and consents that any service of process in such action or proceeding may be made by personal service upon it or them wherever it or they may be them located, or by service as provided by law directed toward the Guarantor, at its last known address.

## WAIVER OF JURY TRIAL AND NOTICE OF HEARING

**GUARANTOR HEREBY WAIVES TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THIS GUARANTY OR THE SECURITY AGREEMENT AND/OR THE ENFORCEMENT OF ANY OF THE LENDER'S RIGHTS. GUARANTOR ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.**

**GUARANTOR HEREBY ACKNOWLEDGES THAT THE TRANSACTION OF WHICH THIS GUARANTY IS A PART IS A COMMERCIAL TRANSACTION, AND TO THE EXTENT ALLOWED UNDER CONNECTICUT GENERAL STATUTES SECTIONS 52-278A TO 52-278N, INCLUSIVE, OR BY OTHER APPLICABLE LAW, HEREBY WAIVES ITS RIGHT TO NOTICE AND HEARING WITH RESPECT TO ANY PREJUDGMENT REMEDY WHICH LENDER OR ITS SUCCESSORS OR ASSIGNS MAY DESIRE TO USE, AND FURTHER WAIVES ITS RIGHTS TO REQUEST THAT THE LENDER POST A BOND, WITH OR WITHOUT SECURITY, TO PROTECT THE GUARANTOR AGAINST DAMAGES THAT MAY BE CAUSED BY ANY PREJUDGMENT REMEDY SOUGHT OR OBTAINED BY THE LENDER. GUARANTOR AUTHORIZES LENDER'S ATTORNEY TO ISSUE A WRIT FOR A PREJUDGMENT REMEDY WITHOUT COURT ORDER, PROVIDED THE COMPLAINT SHALL SET FORTH A COPY OF THIS WAIVER. GUARANTOR ACKNOWLEDGES AND STIPULATES THAT THE ABOVE WAIVER AND AUTHORIZATION ARE GRANTED KNOWINGLY AND FREELY AFTER FULL CONSULTATION WITH COMPETENT COUNSEL AND UNDERSTANDS THAT THE EXERCISE OF LENDER'S RIGHT DESCRIBED ABOVE MAY RESULT IN THE ATTACHMENT OR LEVY AGAINST GUARANTOR'S PROPERTY WITHOUT PRIOR APPROVAL OR SCRUTINY OF A COURT OF LAW.**

Any attempted revocation of this Guaranty Agreement by Guarantor shall be ineffective unless otherwise expressly provided by law and, if applicable law provides that such revocation is effective, such revocation shall be effective only as to Indebtedness which may thereafter become due and owing to Lender and shall not effect the continuing liability hereunder of the Guarantor for all Indebtedness theretofore incurred by, accrued on account of, or arising in respect of, Borrower.

Notwithstanding anything herein to the contrary, in the event that any of the terms or conditions of this Guaranty Agreement directly conflict with the Financing Orders (as defined in

the Loan Agreement) entered by the Bankruptcy Court in Borrower's Bankruptcy Case, the terms and conditions of the Financing Orders shall control and this Guaranty Agreement shall be deemed amended accordingly.

      **IN WITNESS WHEREOF,** Guarantor has caused its duly authorized representative to execute this Guaranty Agreement effective as of the day and year first above written.

KOLO, LLC

By:_____
Name: Peter G. Dunn
Title: Chief Executive Officer